**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| THAN ORN, individually; THALISA ORN, individually; CLARISSE ORN, Guardian on behalf of J. O. and C. O., <br><br>     *Plaintiffs-Appellees*, <br><br> v. <br><br> CITY OF TACOMA, a municipal corporation; KRISTOPHER CLARK, in his individual capacity, <br>     *Defendants-Appellants*. | No. 18-35379 <br><br> D.C. No. 3:13-cv-05974-RBL <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted July 11, 2019
Seattle, Washington

Filed February 3, 2020

Before: Danny J. Boggs,\* Marsha S. Berzon,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford

---

\* The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's order, on summary judgment, denying qualified immunity to a police officer in an action brought pursuant to 42 U.S.C. § 1983 alleging that the officer used excessive force when he shot and severely wounded plaintiff after a slow-speed car pursuit.

The panel first held that, viewing the facts in the light most favorable to plaintiff, a reasonable jury could conclude that the police officer violated plaintiff's Fourth Amendment right to be free from the use of excessive force. Thus, the panel determined that defendant did not have an objectively reasonable basis for believing that plaintiff posed a threat of serious physical harm, either to the officer himself or to others. The panel noted that construing the facts in plaintiff's favor, he never targeted officers with his vehicle or forced other vehicles off the road. In addition, he traveled at normal speeds and stopped at traffic lights and stop signs throughout the pursuit.

Turning to the second step of the qualified immunity analysis, the panel held that plaintiff's right to be free from the use of excessive force was clearly established at the time of the shooting. The panel noted that in October 2011, at least seven circuits had held that an officer lacks an objectively reasonable basis for believing that his own safety

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

is at risk when firing into the side or rear of a vehicle moving away from him. The panel stated that, taking the facts in the light most favorable to plaintiff, a reasonable jury could conclude both that the officer was never in the path of plaintiff's vehicle and that he fired through the passenger-side windows and rear windshield as the vehicle was moving away from him. The panel further held that under plaintiff's version of events, he never engaged in any conduct that suggested his vehicle posed a threat of serious physical harm to another officer on the scene, or to anyone else in the vicinity.

## COUNSEL

Jean P. Homan (argued), Tacoma City's Attorney's Office, Tacoma, Washington, for Defendants-Appellants.

Loren A. Cochran (argued) and Darrell L. Cochran, Pfau Cochran Amala Vertetis PLLC, Tacoma, Washington; Thomas A. Balerud, Law Office of Thomas A. Balerud, Tacoma, Washington; for Plaintiffs-Appellees.

## OPINION

WATFORD, Circuit Judge:

Officer Kristopher Clark of the Tacoma Police Department shot and severely wounded Than Orn on the night of October 12, 2011. Orn sued Clark and the City of Tacoma under 42 U.S.C. § 1983, alleging a violation of his Fourth Amendment right to be free from the use of excessive force. Clark moved for summary judgment on the basis of qualified immunity. The district court denied the motion,

and Clark has taken an interlocutory appeal from that order. We have jurisdiction under the collateral-order doctrine, *see Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014), and now affirm.

I

In an interlocutory appeal challenging the denial of qualified immunity, we must construe the facts in the light most favorable to the plaintiff. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Notwithstanding this clear rule, Clark asks us at several key junctures to credit *his* version of the facts and to assume that a jury would resolve factual disputes in *his* favor. This we are not permitted to do. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam). Unless Orn's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it," we must assume that a jury could find Orn's account of what happened credible, even if it conflicts with Clark's account. *Scott*, 550 U.S. at 380. Here, nothing in the record blatantly contradicts Orn's account of the events in question. The narrative that follows therefore resolves all disputed factual issues in his favor.

At about 8:30 p.m., Orn was driving his wife's Mitsubishi Montero on city streets when he noticed a police car with its lights activated attempting to pull him over. The officer sought to stop Orn because he was driving without his headlights on. Excerpts of Record (ER) 128, 133. Orn was driving with a suspended license at the time and had just smoked crack cocaine. Rather than pull over, he decided to return home to the apartment complex where he lived with his wife, as he knew she needed the car for work. As he made his way home, Orn traveled at 25–35 miles per hour

and stopped at traffic lights and stop signs.  ER 133, 305, 308, 351.

It took Orn roughly 15 minutes to drive home.  Along the way, additional officers joined the slow-speed pursuit, including Clark and his partner Donald Rose, who were driving in a Tacoma Police Department sport utility vehicle. At one point, in an effort to get Orn to stop, several police units attempted unsuccessfully to box him in.  ER 163–65. At another point, officers drove in front of Orn's vehicle to block his path, but Orn drove onto a curb and down a portion of a closed roadway to avoid them.  ER 269, 475, 478.  Later in the pursuit, officers put down spike strips, which Orn managed to circumvent by swerving away from the officers and into the oncoming lane of traffic.  No oncoming vehicles were traveling toward Orn at the time.  ER 104–05, 351, 358.

As the pursuit progressed, officers correctly predicted that Orn might be returning home, since by then they had determined the address to which his vehicle was registered. Clark knew that Orn's apartment complex had a long outdoor parking lot with only two entrances, one at the north end and the other at the south end.  When Clark saw Orn head toward the south entrance, he drove to the north end of the complex and entered there.  Clark positioned his SUV across a narrow point of the single access lane that ran the length of the parking lot, in an effort to prevent Orn from exiting the complex on the north end.

Orn pulled into the south entrance with a caravan of police vehicles following behind him.  He proceeded slowly down the access lane toward the north end of the complex. When he approached Clark's SUV and saw that it was blocking his path, he paused and came to a brief stop. ER 180, 353.

The diagram below depicts the scene of the events that transpired next. ER 535. Clark was standing on the grassy area to the left of his SUV as Orn approached. ER 523. He had his gun drawn with the barrel pointed toward the ground and repeatedly yelled at Orn to stop. ER 341–42, 523. Clark had no reason to believe that Orn had a firearm, and in fact he did not. ER 165, 444. Orn saw Clark and heard his commands but ignored them. ER 342.



After briefly stopping in front of Clark's SUV, Orn drove away from where Clark was standing and attempted to navigate through a narrow opening between the passenger side of Clark's SUV and a nearby parked car. To do so, Orn had to drive up a curb onto a small patch of grass between the two vehicles and then turn his vehicle to the right. ER 342. Given the tightness of the space, Orn was driving very slowly as he attempted this maneuver. ER 179–80. He

estimated his speed at five miles per hour, as did officers at the scene. ER 193, 352.

When Orn began maneuvering around Clark's SUV, another officer, Steven Butts, backed his patrol vehicle into Orn's line of travel to cut off any path of escape through the complex's north entrance. ER 416. That move caused Orn to turn his vehicle more sharply to the right to avoid hitting Officer Butts's vehicle. ER 355.

As Orn moved past Clark's SUV, the panel near the passenger-side rear wheel of Orn's vehicle clipped the passenger-side rear quarter panel of Clark's SUV. (Officer Rose, who remained inside the SUV and felt the impact, described it as a "glancing blow." ER 109.) The left front corner of Orn's vehicle also struck the right front corner of Officer Butts's vehicle. Just after Orn's vehicle moved past Clark's SUV, Orn saw Clark run toward his vehicle on the passenger side and begin firing at him. ER 270, 354, 356. The first round entered through the front passenger-side window of Orn's vehicle; the second and third rounds entered through the rear passenger-side window. ER 435, 440–41, 513–15, 517–18. One of those rounds struck Orn in the spine, which caused Orn's body to go numb. ER 357, 362, 515. He slumped into the passenger seat and the engine of his vehicle revved loudly as his foot floored the accelerator. Clark ran behind Orn's vehicle as it sped away, firing seven more rounds through the rear windshield. ER 212, 440.

Clark disputes this account of the shooting. His account differs from Orn's in two key respects: the manner in which Orn maneuvered his vehicle around Clark's SUV, and where Clark was standing when that occurred. According to Clark, as soon as he saw Orn drive up the curb onto the patch of grass, he ran from where he had been standing and took up a

position behind the rear bumper near the passenger side of his SUV, as depicted by the faint blue figure in the diagram above. ER 299, 524. Clark contends that, as Orn maneuvered between Clark's SUV and the parked car, Orn turned his wheels sharply to the right, which placed Clark in the path of Orn's vehicle. ER 299, 525. At the same time, Clark says, Orn stepped on the gas and propelled the vehicle toward him under "hard acceleration," causing him to fear that he would be run over by Orn's vehicle or pinned between his vehicle and Orn's. ER 299, 524–25. According to Clark, he placed his left hand on the side of Orn's vehicle to brace for the impact while simultaneously raising his right arm above his shoulder. He then fired one or two rounds downward into Orn's vehicle as it passed by. ER 525. Clark asserts that he chased after Orn's vehicle and continued to fire at it from behind because he feared for the safety of Officer Rose, who he thought might be standing in the area where Orn's vehicle was headed. ER 523, 525.

After Clark stopped firing, Orn's vehicle continued forward and hit several parked cars before crashing into a chain-link fence, which stopped the vehicle's forward progress. Officers took Orn into custody and summoned medical help. In all, three of the ten rounds fired by Clark struck Orn. The bullet that lodged in his spine has left him paralyzed from the waist down.

County prosecutors charged Orn with using his vehicle to assault Clark and with attempting to elude a pursuing police vehicle. The jury acquitted Orn of the assault charge. ER 253. It also acquitted him of the eluding charge, convicting him instead of the lesser-included offense of failure to obey a law-enforcement officer. ER 254. Orn was ordered to pay a fine of $250.

II

When an officer asserts qualified immunity as a defense, our analysis proceeds in two steps. We first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If so, we then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986). We have the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, however, we think both steps of the analysis must be resolved against Clark.

A

At the first step, a reasonable jury could conclude that Clark violated Orn's Fourth Amendment right to be free from the use of excessive force.

Determining whether an officer's use of force violates the Fourth Amendment requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted). That inquiry generally involves an assessment of factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In the context

involved here, the Supreme Court has crafted a more definitive rule:  An officer may use deadly force to apprehend a fleeing suspect only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.  A suspect may pose such a threat if "there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm," or if the suspect threatens the officer or others with a weapon capable of inflicting such harm. *Id.*

The key question, then, is whether Clark had an objectively reasonable basis for believing that Orn posed a threat of serious physical harm, either to Clark himself or to others. *See Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (per curiam).  Taking the facts in the light most favorable to Orn, and giving due deference to Clark's assessment of the danger presented by the situation he confronted, *see id.* at 477, we conclude the answer is no.

1.  We'll begin with the threat to Clark himself.  A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it.  According to Orn's version of events, Clark was never at risk of being struck by Orn's vehicle because he was never in the vehicle's path of travel.  As Orn's vehicle moved past Clark's SUV, Clark ran toward the passenger side of Orn's vehicle and opened fire through the passenger-side windows.  At that point, Clark could not reasonably have feared for his own safety because he was on the side of Orn's vehicle as it was traveling away from him. *See, e.g.*, *Godawa v. Byrd*, 798 F.3d 457, 466 (6th Cir. 2015); *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003); *Abraham v. Raso*, 183 F.3d 279, 293–94 (3d Cir. 1999).  And Clark was

obviously not in harm's way as he chased after Orn's vehicle and fired additional rounds at Orn through the rear windshield.

Clark does not dispute that an officer who fires into the side or rear of a vehicle moving away from him lacks an objectively reasonable basis for claiming that he did so out of fear for his own safety. He instead urges us to analyze the lawfulness of his actions under his version of events, in which he stood in the path of Orn's vehicle as it accelerated toward him, causing him to fear for his life. As noted at the outset, we cannot analyze the case through that lens because Clark's version of events conflicts with the facts construed in the light most favorable to Orn. Most fundamentally, Orn's testimony provides an account of the shooting in which Clark was never at risk of being struck by Orn's vehicle. Although Orn's testimony alone would be sufficient to create a material factual dispute on this point, Officer Butts's testimony provides additional support for Orn's version of events. Officer Butts testified that he saw Clark standing behind the rear bumper of the SUV only after Clark fired the first round of shots, and that he did not see Clark make any physical contact with Orn's vehicle. ER 194–96, 198–99. Officer Butts also testified that he heard Orn's engine rev and saw the vehicle accelerate after the first shots were fired, not before as Clark maintains. ER 196–97, 201. A reasonable jury could find Officer Butts's testimony significant because his vehicle was parked facing the rear passenger side of Clark's SUV, giving him an up-close vantage point from which to see and hear what transpired just before the shooting.

In an effort to bolster his version of events and discredit Orn's, Clark relies on two pieces of evidence that he views as critical. First, he points to a tire track left at the scene,

which he contends shows that Orn must have accelerated *before* being shot.  ER 207, 462–63, 538, 562.  Second, Clark notes that detectives found an unidentified palm print on the passenger side of Orn's vehicle, in the area where Clark said he placed his hand to brace for the impact.  ER 448–49.  While these two pieces of evidence provide some support for Clark's version of events, they are nowhere near conclusive enough to meet *Scott*'s "blatantly contradicts" standard, where the Court relied on a videotape clearly depicting the events in question.  550 U.S. at 379–80.

Even if a jury found that Clark was standing behind the rear bumper of his SUV, as he claims, it could still conclude that Clark lacked an objectively reasonable basis to fear for his own safety.  As Orn's vehicle approached, Clark concedes that he was not initially in the vehicle's path of travel.  ER 524.  He contends that his safety was imperiled when Orn turned his wheels more sharply to the right to squeeze between Clark's SUV and Officer Butts's patrol car.  At that point, Orn's vehicle was moving at just five miles per hour.  Clark could therefore have avoided any risk of being struck by simply taking a step back, a common-sense conclusion confirmed by Clark's own admission that he "was able to step backwards and get out of the path of Mr. Orn's vehicle."  ER 525.  In similar circumstances, we held that a reasonable jury could find that an officer standing near a slow-moving vehicle "would not have perceived himself to be in danger of serious bodily harm," because he could have avoided any risk of injury "by simply stepping to the side."  *Acosta v. City & County of San Francisco*, 83 F.3d

1143, 1146–47 (9th Cir. 1996); *see also Abraham*, 183 F.3d at 294.[1]

2.   The remaining question is whether Clark had an objectively reasonable basis for believing that Orn posed a threat of serious physical harm to others.  On this point, in both the district court and before our court, Clark has argued only that Orn posed a threat to his partner, Officer Rose.  As noted earlier, Clark mistakenly (but reasonably) believed that Officer Rose had exited the SUV and may have been standing in the area where Orn's vehicle was headed.  In fact, Officer Rose remained inside the SUV until after the shooting.

Clark claims that he feared for the safety of Officer Rose because Orn had just attempted to run Clark over and thus might have been inclined to assault Officer Rose as well. ER 299–300, 525.  But if a jury rejects Clark's account of the shooting and concludes that Clark was never at risk of being struck by Orn's vehicle, nothing else Orn had done suggested that he posed a threat to the safety of Officer Rose.

---

[1] We need not decide whether a jury could find Clark's use of deadly force unreasonable based in part on his decision to move from the grassy area where he had been standing (a position of relative safety) to take up a more dangerous position behind the rear bumper of his SUV as Orn's vehicle approached.  The reasonableness of an officer's use of force must be judged by considering "the totality of the circumstances," *Garner*, 471 U.S. at 8–9, and several circuits have held that "[w]here a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive."  *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008); *accord Thomas v. Durastanti*, 607 F.3d 655, 667 (10th Cir. 2010); *Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).  In *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), the Supreme Court did not foreclose this theory of liability, even as it rejected our circuit's former "provocation rule."  *See id.* at 1547 n.*

Orn was driving at a slow speed in a non-reckless manner as he maneuvered around Clark's SUV, and although his vehicle clipped Clark's SUV and Officer Butts's patrol car as he maneuvered between them, the contact was slight and clearly accidental. *See Latits v. Phillips*, 878 F.3d 541, 549–50 (6th Cir. 2017) (accidental collision with police vehicle causing minor damage did not provide a basis for believing that suspect would harm officers); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (same). In addition, at every juncture earlier in the evening, Orn had deliberately driven his vehicle *away* from nearby officers. Taking this view of the facts, a reasonable jury could conclude that Clark had no basis for believing that Orn's vehicle posed a threat to Officer Rose. *See Abraham*, 183 F.3d at 294–95; *cf. Scott v. Edinburg*, 346 F.3d 752, 758 (7th Cir. 2003) (suspect's attempt to run over officer was relevant to the officer's "perception that the bystanders were in danger").

Clark has not argued that his use of deadly force was justified on the theory that permitting Orn to escape could have posed a threat to the safety of the general public. Nor is there any basis in the record for making such an argument. A fleeing suspect's escape can pose a threat to the public when police have probable cause to believe that the suspect has committed a violent crime, *see Garner*, 471 U.S. at 11, but neither of the offenses for which Orn was wanted involved any sort of violence. Such a threat can also exist when the suspect has driven in a manner that puts the lives of pedestrians or other motorists at risk, as by leading officers on a high-speed chase. *See Mullenix v. Luna*, 136 S. Ct. 305, 306, 309 (2015) (per curiam) (suspect drove at over 100 miles per hour and threatened to shoot police officers unless they abandoned the pursuit); *Plumhoff*, 572 U.S. at 776 (suspect swerved between congested traffic lanes at speeds exceeding 100 miles per hour); *Scott*, 550 U.S. at 380

(suspect engaged in "a Hollywood-style car chase of the most frightening sort"). In such cases, officers have an interest in terminating the suspect's flight because the flight itself poses a threat of serious physical harm to others. But to warrant the use of deadly force, a motorist's prior interactions with police must have demonstrated that "he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Latits*, 878 F.3d at 548 (internal quotation marks omitted).

A reasonable jury could conclude that Orn did not engage in any such conduct here, and that Clark therefore had no basis for believing that Orn would pose a threat of serious physical harm to the general public if permitted to escape. Construing the facts in the light most favorable to Orn, he never targeted officers with his vehicle or forced other vehicles off the road. In addition, he traveled at normal speeds and stopped at traffic lights and stop signs throughout the pursuit. ER 305, 308, 351. Indeed, the Tacoma Police Department's Pursuit Review Committee conducted a review of the pursuit and classified it as involving only a "Failure to Yield," which occurs when a driver "fails or refuses to immediately bring his or her vehicle to a stop, and drives in a manner that is not reckless and does not pose an immediate threat to community safety." ER 219.

In his brief before our court, Clark hints at a different view of the facts, but in doing so he simply highlights the factual disputes that a jury must ultimately resolve. For example, Clark asserts that when officers attempted to box Orn in, he deliberately swerved toward one of them, forcing the officer to veer into the next lane of traffic to avoid a collision. ER 161, 166. That incident, if it did occur, is irrelevant to the Fourth Amendment analysis because Clark

did not witness it and a reasonable jury could conclude that he did not learn about it until after the shooting. *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). The officer involved in the alleged incident did not report it over the radio, ER 162, and Officer Rose, who was riding in the same vehicle as Clark, testified that he did not recall hearing any radio transmissions during the pursuit indicating that Orn's driving had endangered other officers or the public, ER 105. Clark further asserts that Orn drove onto a pedestrian path during the pursuit, but Clark did not witness this incident either, and the officer who reported it over the radio stated only that Orn had "cut over the curb." ER 306. Clark also points to Orn's actions in evading the spike strips—something Clark did witness—but it is undisputed that Orn swerved away from the officers who deployed the strips and that he did not endanger any motorists in the oncoming lane of traffic because there were no motorists coming toward Orn.

In short, if Clark decides to pursue this line of argument at trial, a jury will have to determine whether Orn engaged in conduct that demonstrated a willingness either to injure officers or to "persist in extremely reckless behavior that threatened the lives of all those around." *Latits*, 878 F.3d at 548.

## B

We turn next to the second step of the qualified immunity analysis, which asks whether Orn's right to be free from the use of excessive force was clearly established at the time of the shooting. In making that determination, we are mindful of the Supreme Court's repeated admonition not to define the right at issue at a high level of generality. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765,

1775–76 (2015); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Qualified immunity is designed to ensure that officers receive fair notice of the illegality of their conduct, and general standards often fail to provide such notice in excessive force cases, where "the result depends very much on the facts of each case." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).

In an "obvious case," the general standards established in *Garner* and *Graham* can suffice to put an officer on notice that his conduct is unlawful. *Brosseau*, 543 U.S. at 199. But usually uncertainty will remain as to whether the particular set of facts confronting an officer satisfies those standards. *See Sheehan*, 135 S. Ct. at 1777. When that is the case, an officer will be "entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted). Stated differently, precedent in existence at the time of the officer's actions must render the unlawfulness of his conduct "beyond debate." *al-Kidd*, 563 U.S. at 741. That does not mean a plaintiff must identify prior cases that are "directly on point." *Id.* The plaintiff must instead identify precedent that holds "certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Saucier*, 533 U.S. at 202.

1. To the extent Clark seeks to justify his use of deadly force based on a threat to his own safety, existing precedent declared his conduct unconstitutional in circumstances indistinguishable from those present here. By the time of the shooting in October 2011, at least seven circuits had held that an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him. *See Cordova v. Aragon*, 569 F.3d 1183, 1187, 1191 (10th Cir.

2009); *Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008); *Waterman v. Batton*, 393 F.3d 471, 482 (4th Cir. 2005); *Cowan*, 352 F.3d at 763; *Vaughan*, 343 F.3d at 1327, 1330–31; *Abraham*, 183 F.3d at 293–94; *see also Scott*, 346 F.3d at 757–58. To the same effect is our circuit's decision in *Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007), where we held that an officer violated the Fourth Amendment by firing through the front windshield of a vehicle moving backward away from him. *Id.* at 992–93. As discussed above, taking the facts in the light most favorable to Orn, a reasonable jury could conclude both that Clark was never in the path of Orn's vehicle and that he fired through the passenger-side windows and rear windshield as the vehicle was moving away from him. On that score, "existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153.

Clark contests this conclusion only by urging us to credit his version of events, just as he did for purposes of the Fourth Amendment analysis at step one. He insists that "the specific facts at issue" are those in which he was standing in the path of a vehicle speeding toward him under "hard acceleration." The cases on which he relies for support all involve officers who were in the path of vehicles moving toward them. *See Thomas v. Durastanti*, 607 F.3d 655, 665 (10th Cir. 2010); *Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007); *Troupe v. Sarasota County*, 419 F.3d 1160, 1168 (11th Cir. 2005); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005). These cases are inapposite here because we are not permitted to analyze Clark's entitlement to qualified immunity under his version of the facts.

Even if the jury were to conclude that Clark was standing behind the rear bumper of his SUV as Orn's vehicle approached, he would not be entitled to qualified immunity.

We held in *Acosta* that an officer's use of deadly force violated the Fourth Amendment in circumstances similar to those present here. There, the defendant officer was standing in front of the suspect's car "closer to the side than the dead-center," 83 F.3d at 1146, and the vehicle was "moving or rolling very slowly from a standstill" as it approached him. *Id.* at 1147. We stated that the car was moving slowly enough that the officer could have avoided any risk of injury "by simply stepping to the side," rendering his use of deadly force unreasonable. *Id.* at 1146. The facts of this case, taken in the light most favorable to Orn, are not fairly distinguishable from those in *Acosta*. If Orn was traveling at only five miles per hour as he maneuvered past Clark's SUV, and if he did not accelerate until after being shot, a reasonable jury could conclude that Clark lacked an objectively reasonable basis to fear for his own safety, as he could simply have stepped back to avoid being injured.

2. Clark is not entitled to qualified immunity based on his claimed fear for the safety of others—in this case, Officer Rose. The objective reasonableness of Clark's fear for Officer Rose's safety is again dependent upon the jury's acceptance of his account of the shooting. According to Clark, Orn nearly ran him over after turning the vehicle toward him and accelerating rapidly. But a reasonable jury could conclude, contrary to Clark's version of events, that he was never at risk of being struck by Orn's vehicle. And if the jury disbelieved Clark's account of having been assaulted by Orn, it could also conclude that nothing else about Orn's behavior that night, either during the course of the pursuit or in the parking lot, gave rise to a basis for believing that he posed a significant threat to Officer Rose. *See, e.g.*, *Lytle*, 560 F.3d at 416–17; *Abraham*, 183 F.3d at 293.

The cases Clark cites on this point are distinguishable when the facts are viewed in the light most favorable to Orn. In *Brosseau*, the suspect had a felony no-bail warrant out for his arrest and was attempting to elude capture by hiding near his mother's house. 543 U.S. at 195. When officers found him, he ran to the driveway and jumped into his car, which was facing the street. Two vehicles directly blocked his path: a small car parked in the driveway facing the suspect's car; and a pickup truck parked in the street blocking the driveway. *Id*. at 195–96. Both vehicles were occupied. The defendant officer believed that the suspect had sprinted to his car in order to retrieve a weapon, and she ordered him at gunpoint to get out of the car. When he refused to comply, the officer shattered the driver's side window with her gun, reached in to try to grab the keys, and struck the suspect in the head with her gun. The suspect nonetheless started the car and began to move forward when the officer fired one round through the rear driver's side window. She did so to protect the occupants of the two vehicles directly blocking the suspect's path, as well as fellow officers who were on foot in the immediate area. *Id.* at 196–97. Given the suspect's apparent determination to escape at all costs, notwithstanding the officer's violent attempts to restrain him, the Supreme Court held that the officer had reasonable grounds to believe that the suspect would race out of the driveway—and recklessly endanger the lives of those in his path—if allowed to drive off.

In *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), the suspect had engaged the police in a short pursuit before crashing into a telephone pole. Two officers, Key and Torres, approached the vehicle on foot. Key attempted to open the driver's door but slipped and fell to the ground as the suspect's vehicle began to move in reverse. *Id.* at 548–49. The engine revved and the wheels were spinning and

throwing up mud due to the slippery conditions. As the vehicle accelerated backward, it arced toward the driver's side, leading Torres to fear that Key had been run over and was in danger of being struck again. Torres fired through the passenger-side window to protect both Key and himself. *Id.* at 549. We held that the undisputed facts provided Torres with an objectively reasonable basis to fear for both Key's safety and his own. *Id.* at 551–52.

The facts of this case bear no resemblance to those in *Brosseau* and *Wilkinson*. There were no officers or other individuals in Orn's path. The only person Clark thought might be in the immediate area was Officer Rose. Yet under Orn's version of events, he never engaged in any conduct that suggested his vehicle posed a threat of serious physical harm to Officer Rose, or to anyone else in the vicinity.

Finally, although Clark has not argued that Orn posed a threat to the safety of the general public, we do not think Clark could claim qualified immunity on that basis either. Officers may use deadly force to halt the flight (or continued flight) of a motorist who they reasonably believe will pose a deadly threat to the lives of pedestrians or other motorists. *Plumhoff*, 572 U.S. at 777. But existing precedent made clear that Orn's conduct prior to the shooting did not give rise to an objectively reasonable basis for believing that Orn posed such a threat.

The cases upholding the use of deadly force to protect the public from a fleeing motorist have typically involved suspects who drove at extremely high speeds, endangered other motorists on the road, or intentionally targeted police officers with their vehicles. *See, e.g.*, *Scott*, 550 U.S. at 379–80; *Pace v. Capobianco*, 283 F.3d 1275, 1277–78, 1282–83 (11th Cir. 2002); *Cole v. Bone*, 993 F.2d 1328, 1330–31, 1333–34 (8th Cir. 1993); *Smith v. Freland*, 954 F.2d 343,

344, 347 (6th Cir. 1992). In these cases, the suspect's conduct before the shooting demonstrated that he "was likely to continue to threaten the lives of those around him in his attempt to escape." *Cupp*, 430 F.3d at 775. As discussed above, Orn engaged in no such conduct here. In fact, his driving prior to the shooting was less hazardous than that of the suspects in *Cordova* and *Lytle*, two cases in which the courts held, after construing the facts in the light most favorable to the plaintiffs, that an officer's use of deadly force violated the Fourth Amendment. *See Cordova*, 569 F.3d at 1186, 1190 (suspect ran two red lights, crossed onto the wrong side of a highway, and attempted to ram police vehicles on two occasions); *Lytle*, 560 F.3d at 407, 413 (suspect speeding through a residential area collided with a car in an oncoming lane of traffic).[2]

*       *       *

In the end, this is not a case in which the legality of the officer's conduct falls within the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (internal quotation marks omitted). When the facts are viewed in the light most favorable to Orn, as they must be at this point in the litigation, Clark had "fair and clear warning

---

[2] In denying the officer qualified immunity, the *Lytle* court explained that the suspect had a clearly established right to be free from the use of deadly force because he did not "pose a sufficient threat of harm to the officer or others." 560 F.3d at 417. The court in *Cordova* reaffirmed this principle, but ultimately granted qualified immunity to the officer in that case based on the specific facts at issue. 569 F.3d at 1193. In doing so, the court acknowledged that the outcome likely would have been different had the suspect posed a less substantial risk of harm to others, or at least the same degree of risk as the suspect in *Lytle*. *Id.* Because Orn presented even less of a risk of harm to third parties than the driver in *Lytle*, *Cordova*'s qualified immunity holding, if anything, supports our conclusion.

of what the Constitution requires." *Sheehan*, 135 S. Ct. at 1778 (internal quotation marks omitted). What Clark most forcefully contests is whether his alternative account of the shooting should be accepted as true. Factual disputes of that order must be resolved by a jury, not by a court adjudicating a motion for summary judgment. *Tolan*, 572 U.S. at 656; *see Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring in the judgment).

**AFFIRMED.**