**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAMON CORTESLUNA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>MANUEL LEON; ROBERT KENSIC;<br>DANIEL RIVAS-VILLEGAS; CITY OF<br>UNION CITY, California,<br>*Defendants-Appellees.* | No. 19-15105<br><br>D.C. No.<br>3:17-cv-05133-<br>JSC<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jacqueline Scott Corley, Magistrate Judge, Presiding

Argued and Submitted April 29, 2020
San Francisco, California

Filed October 27, 2020

Before: Ronald Lee Gilman,[*] Susan P. Graber, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Gilman;
Partial Concurrence and Partial Dissent by Judge Collins

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for
the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of defendants, and remanded, in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that police officers used excessive force in effecting plaintiff's arrest.

The panel affirmed the district court's summary judgment in favor of officer Leon. The panel held that even taking plaintiff's version of the facts as true, as was required at this stage of the proceedings, a reasonable jury would not find a Fourth Amendment violation because Leon's acts were objectively reasonable under the circumstances. The panel first determined that the alleged crime was severe: a twelve-year-old girl told a 911 dispatcher that plaintiff had threatened his girlfriend and her daughters with a chainsaw. The panel then determined that Officer Leon faced an immediate threat. The panel noted that plaintiff had a knife in the left pocket of his pants and had lowered his hands toward his thighs—and thus toward the knife—after which Leon fired a beanbag shotgun. Finally, the panel determined that plaintiff's hands remained near the knife in his pocket at the time of the second beanbag shot.

The panel reversed the district court's summary judgment in favor of officer Rivas-Villegas. The panel first held that there was a genuine issue of issue of fact as to whether the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

force that Rivas-Villegas used when he kneeled on plaintiff's back when he was lying face down on the ground was excessive. The panel then determined that controlling precedent at the time put officers on notice that kneeling on a prone and non-resisting person's back so hard as to cause injury was excessive.

The panel affirmed the district court's summary judgment in favor of Sergeant Kensic, determining that he lacked any realistic opportunity to intercede to stop the excessive force. Finally, because the panel reversed the grant of summary judgment as to officer Rivas-Villegas, it remanded to the district court for consideration of the other elements of plaintiff's claim against the City of Union City under *Monell v. Department of Social Services,* 436 U.S. 658 (1978). For the same reason, the panel reinstated plaintiff's state-law claims relating to Rivas-Villegas' conduct.

Concurring in part and dissenting in part, Judge Gilman fully concurred in the portions of the majority opinion regarding the disposition as to Sergeant Kensic and Officer Rivas-Villegas. He respectfully dissented from the portion affirming the grant of summary judgment in favor of Officer Manuel Leon, stating that he had no doubt that a jury could reasonably find in plaintiff's favor based on the facts that he has presented.

Concurring in part and dissenting in part, Judge Collins concurred in the majority opinion insofar as it partially affirmed the district court's judgment dismissing plaintiff's claims of excessive force in connection with his arrest. However, he disagreed with the majority's reversal of the judgment in favor of Officer Rivas-Villegas and its partial reversal of the judgment dismissing plaintiff's claims against

the City.  Judge Collins would affirm the judgment in its entirety.

## COUNSEL

Audrey Smith (argued) and Robert G. Howie, Howie & Smith LLP, San Mateo, California, for Plaintiff-Appellant.

Lori A. Sebransky (argued) and Kevin P. Allen, Allen Glaessner Hazelwood & Werth LLP, San Francisco, California, for Defendants-Appellees.

## OPINION

GRABER, Circuit Judge:

Plaintiff Ramon Cortesluna appeals from the summary judgment entered in favor of Defendants Manuel Leon, Daniel Rivas-Villegas, Robert Kensic, and the City of Union City, California ("City"), in this action alleging that the individual Defendants used excessive force in effecting Plaintiff's arrest. We affirm in part, reverse in part, and remand.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

On the night of November 6, 2016, a 911 dispatcher received a call in which a 12-year-old girl, I.R., reported that she, her mother, and her 15-year-old sister were barricaded in a room at their home because her mother's boyfriend, Plaintiff, had a chainsaw and was going to attack them. I.R. said that Plaintiff was "always drinking," had "anger issues," was "really mad," and was using the chainsaw to "break something in the house." I.R. said that her mother was holding the door closed to prevent Plaintiff from entering and hurting them. I.R.'s sister then took the phone and confirmed that Plaintiff was "right outside the bedroom door" and was "sawing on their door knob." A manual sawing sound was audible to the 911 operator. I.R.'s sister described Plaintiff and his clothing.

---

[1] The underlying facts, except those regarding Plaintiff's alleged injuries, are undisputed.

A police dispatcher requested that officers respond. The dispatcher reported that a 12-year-old girl said that her mother's boyfriend had a chainsaw and was trying to hurt her, her sister, and her mother, who were together in a room. The dispatcher also relayed the girl's statement that the boyfriend was "always drinking" and was using the chainsaw to break something in the house. The dispatcher further reported that there had been another potentially related 911 call in the area and that, on that call, crying could be heard, but the caller hung up without speaking.

Defendants Leon, Rivas-Villegas, and Kensic, along with two other police officers, responded to the scene. When the first three officers, including Rivas-Villegas and Kensic, arrived, they observed Plaintiff's home for several minutes and saw that "[Plaintiff] is right here" in his window and "doesn't have anything in his hand" except, at some points, a beer. The officers checked with dispatch to confirm that the caller really reported a chainsaw. The dispatcher acknowledged "we can't hear [a chainsaw] over the phone" but suggested that Plaintiff could be using the chainsaw "manually." One officer asked the 911 operator if the girl and her family could leave the house. The operator replied that they were unable to get out and that, during the call, she heard sawing sounds in the background, as if the boyfriend were trying to saw the bedroom door down.

Defendant Leon arrived at the scene later and might have heard the radioed conversation with the dispatcher. When Leon arrived, another officer told him, "so, he's standing right here drinking a beer. What do you think [about] just giving him commands, having him come out, and do a protective sweep?" The officers formulated a plan to

approach the house and "breach it with less lethal, if we need to," a reference to Leon's beanbag shotgun.[2]

Rivas-Villegas knocked on the front door, stating, "[P]olice department, come to the front door, Union City police, come to the front door." A few seconds later, Plaintiff emerged through a sliding glass door near the front door, holding a large metal object. Kensic said, "He's coming . . . he's got a weapon in his hand" that looks "like a crowbar." Plaintiff was ordered to "drop it," which he did. Meanwhile, Leon said, "I'm going to hit him with less lethal," that is, his beanbag shotgun, and told another officer to get out of his way.

Rivas-Villegas then ordered Plaintiff to "come out, put your hands up, walk out towards me." Plaintiff put his hands up, as Rivas-Villegas told Plaintiff to "keep coming."

As Plaintiff walked out of the house and toward the officers, Rivas-Villegas said, "Stop. Get on your knees." Plaintiff stopped approximately ten to eleven feet from the officers. Immediately after Rivas-Villegas' order, Kensic saw a knife in the front left pocket of Plaintiff's sweatpants, and he announced that Plaintiff had "a knife in his left pocket, knife in his pocket." Kensic then told Plaintiff, "[D]on't, don't put your hands down" and "hands up." After Kensic shouted this last order, Plaintiff turned his head toward Kensic, who was on Plaintiff's left side, (and away from

---

[2] A beanbag shotgun is a twelve-gauge shotgun loaded with beanbag rounds, consisting of lead shot contained in a cloth sack. *Deorle v. Rutherford*, 272 F.3d 1272, 1277 & n.8 (9th Cir. 2001). By design, beanbag shotguns typically cause serious injury rather than death, although death can result.

Leon, who was on Plaintiff's right side) and simultaneously lowered his head and his hands. Leon immediately shot Plaintiff with a beanbag round from his shotgun and quickly fired a second beanbag shot while Plaintiff's hands were still in a downward position near his belly, where the first shot hit. The second shot hit him on the hip. Roughly two seconds elapsed between Kensic's "hands up" order and the second shot.

After the second shot, Plaintiff again raised his hands over his head. The officers ordered him to "[G]et down." As Plaintiff was lowering himself to the ground, Rivas-Villegas used his foot to push Plaintiff to the ground. Rivas-Villegas then pressed his knee into Plaintiff's back and pulled Plaintiff's arms behind his back. Leon handcuffed Plaintiff's hands while Rivas-Villegas held his position. A few moments later, Rivas-Villegas lifted Plaintiff up by his handcuffed hands and moved him away from the doorway. Other officers then entered the house, and the incident ended.

Plaintiff filed a complaint asserting (a) a claim under 42 U.S.C. § 1983 against Leon and Rivas-Villegas for excessive force; (b) a § 1983 claim against Kensic for failing to intervene and stop the excessive force; (c) a claim against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for the officers' actions; and (d) several state-law claims. Plaintiff claims that he suffers physical, emotional, and economic injuries as a result of the officers' conduct.

The district court granted summary judgment to the individual Defendants on the federal claims. As to Leon and Rivas-Villegas, the court ruled both that the force used was objectively reasonable in the circumstances and that they

were entitled to qualified immunity. As to Kensic, the court ruled that he had no reasonable opportunity to intervene and therefore could not be liable. With summary judgment granted in favor of the individual Defendants, the court dismissed Plaintiff's claim against the City. The court then declined to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismissed them without prejudice. This timely appeal followed.

## II

## STANDARD OF REVIEW

We review de novo the propriety of summary judgment. *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Blight v. City of Manteca*, 944 F.3d 1061, 1065–66 (9th Cir. 2019).

We also review de novo the ruling that a police officer is entitled to qualified immunity. *S.B.*, 864 F.3d at 1013. If the parties' versions of the facts differ, we use the version most favorable to Plaintiff, the non-moving party. *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc).

III

DISCUSSION

A. *Principles of Qualified Immunity*

Qualified immunity protects individual officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In evaluating an assertion of qualified immunity, we undertake a two-part analysis, asking (1) "whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right," and (2) whether that right was "clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

At step one, we determine whether a reasonable jury could conclude that an officer's use of force violated the Fourth Amendment by "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). That analysis incorporates many factors,[3] but the most important factor is "whether the suspect

---

[3] Those factors include the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injuries; any effort made by the officer to temper or to limit the amount of force; the threat reasonably perceived by the officer; the severity of the plaintiff's crime; whether the plaintiff posed an immediate threat to the

posed an immediate threat to the safety of the officers or others." *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (internal quotation marks omitted).  Although we take disputed facts in the light most favorable to the plaintiff, we view the facts from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Because of the factual disputes typical of excessive-force claims, we have recognized that summary judgment at this step "should be granted sparingly." *Smith*, 394 F.3d at 701 (internal quotation marks omitted).  Nonetheless, summary judgment may be granted to an officer if, "after resolving all factual disputes in favor of the plaintiff," the court concludes that the force used was "objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

At step two, we determine whether the officer's conduct violated "clearly established" law. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).  In doing so, we are mindful of the Supreme Court's repeated instruction "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Rather, we must decide "whether the violative nature of particular conduct [was] clearly established." *Id.*  That is, existing precedent must already have placed the constitutional or statutory question beyond debate. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).  We have interpreted those instructions to mean that liability does not attach unless a case exists in which a police officer acting under similar circumstances was

---

safety of the officers or others; and whether the plaintiff actively resisted arrest or attempted to flee. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Orn*, 949 F.3d at 1174.

held to have violated the Fourth Amendment. *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (per curiam).[4]

B.  *Officer Leon*

Plaintiff asserts that Leon violated the Fourth Amendment by shooting him twice with a beanbag shotgun. Even taking Plaintiff's version of the facts as true, as we must at this stage, a reasonable jury would not find a Fourth Amendment violation, because Leon's acts were objectively reasonable in the circumstances. Therefore, we affirm the district court's grant of summary judgment to Leon.

The reasonableness of an officer's use of force "traditionally is a question of fact for the jury." *Scott*, 39 F.3d at 915. Nevertheless, we may depart from that traditional rule if any reasonable juror would find that the use of force was "objectively reasonable under the circumstances." *Id.*

As to the personal intrusion, because beanbag rounds are "potentially lethal at thirty feet and could be lethal at distances up to fifty feet," they are "not to be deployed lightly." *Deorle*, 272 F.3d at 1279–80. Their use "is permissible only when a strong governmental interest compels the employment of such force." *Id.* at 1280. In

---

[4] An exception exists for "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). That exception does not apply here.

assessing the governmental interest, we consider "(1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396)).

Here, first, the alleged crime was severe: a twelve-year-old girl told a 911 dispatcher that Plaintiff had threatened his girlfriend and her daughters with a chainsaw. The threat was just as great even if Plaintiff had been using the saw manually.

Leon faced an immediate threat, the second and most important factor. *C.V. ex rel. Villegas*, 823 F.3d at 1255. Although Plaintiff did not have a chainsaw when the officers arrived, Plaintiff emerged from the house holding a large metal object. Plaintiff dropped the object when ordered to do so, but he still had a knife in the left pocket of his pants. Leon, who was standing diagonally to Plaintiff's right, could not see the knife from his position. Kensic announced that Plaintiff had a knife and ordered Plaintiff to put his hands up. Plaintiff instead lowered his hands toward his thighs—and thus toward the knife—after which Leon fired the beanbag shotgun.

The third factor pertains to Plaintiff's resistance. Before the first shot was fired, Plaintiff put his hands down, and closer to the knife in his pocket, after police repeatedly told him to put his hands up. Plaintiff's hands remained near the knife in his pocket at the time of the second shot.

In summary, even viewing the facts in Plaintiff's favor, the force that Leon applied was objectively reasonable in the circumstances, considering both the level of intrusion and the strength of the government's interest. It bears repeating that our inquiry is an objective one. Despite our colleague's suggestion, Judge Gilman's dissent at 22, we cannot consider that Leon announced that he was "going to hit [Plaintiff] with less lethal" twenty seconds before pulling the trigger. As the Supreme Court has repeatedly stressed, we must assess officers' use of force "without regard to their underlying intent." *Graham*, 490 U.S. at 397. Accordingly, we affirm the summary judgment entered in favor of Leon.

## C. *Officer Rivas-Villegas*

Plaintiff alleges that Rivas-Villegas violated his Fourth Amendment right to be free from excessive force by leaning too hard on his back, causing injury. Taking Plaintiff's version of the facts as true, we agree. Because we also hold that controlling precedent put officers on notice that such force is excessive, Rivas-Villegas is not entitled to qualified immunity. We therefore reverse and remand for a jury to decide whether Rivas-Villegas used excessive force and, if so, to assess damages.

### 1. *Rivas-Villegas' use of force was excessive.*

Although we have held that Leon did not violate Plaintiff's Fourth Amendment rights by using excessive force, the objective situation altered dramatically after Leon shot Plaintiff twice with beanbag rounds. By the time Rivas-Villegas put pressure on Plaintiff's back, Plaintiff no longer posed a risk. He was lying face down on the ground, experiencing visible pain from having been shot by the two

beanbag rounds, and not resisting. Although the knife remained in Plaintiff's pocket, Rivas-Villegas—unlike Leon—could have seen that the knife was protruding blade-up such that it would not have been possible for Plaintiff to grab it and attack anyone. Thus, the governmental interest that we must consider had decreased greatly from when Leon fired on Plaintiff.

And although a knee on the back is a lesser personal intrusion than beanbag rounds, it still constitutes a meaningful personal intrusion when it causes injury. *LaLonde v. County of Riverside*, 204 F.3d 947, 952 (9th Cir. 2000). In evaluating reasonableness, we may consider the presence and severity of a plaintiff's injuries, but injuries are not required. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). This court long ago recognized that a plaintiff asserting a claim of excessive force "is not required to show a significant injury." *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993), *as amended on denial of reh'g* (Oct. 28, 1993); *see also Morales v. Fry*, 873 F.3d 817, 820–21 (9th Cir. 2017) (discussing this circuit's requirement under *Floyd v. Laws*, 929 F.2d 1390, 1402–03 (9th Cir. 1991), that a court award nominal damages where a jury finds for a plaintiff on an excessive-force claim but awards no damages). If the use of force is excessive and there is a case on point that alerted the officer to the unconstitutionality of his conduct (an issue to which we will turn next), there is no added requirement for a specific level of damage or injury. Here, Plaintiff alleges that he now suffers ongoing neck and back pain, headaches, and emotional distress on account of Rivas-Villegas' actions. That is sufficient to create a genuine dispute of material fact that requires resolution by a jury. The credibility and weight

of Plaintiff's evidence are for the jury, not us, to decide.**[5]** Because we must view all the evidence in Plaintiff's favor, Rivas-Villegas used excessive force.

## 2. *Rivas-Villegas violated clearly established law.*

At step two, Rivas-Villegas is not entitled to qualified immunity because existing precedent put him on notice that his conduct constituted excessive force. In *LaLonde*, an officer grabbed the plaintiff, knocked him to the ground, straddled him, and handcuffed him. 204 F.3d at 952. Allegedly, another officer then "forcefully put his knee into LaLonde's back, causing him significant pain" and a lingering back injury. *Id.* We reversed the summary judgment entered in favor of the officers because the allegations, if true, "constitute[d] a clear violation of [LaLonde's] Fourth Amendment rights." *Id.* at 962.**[6]**

---

**[5]** Judge Collins' dissent errs by "disregard[ing]" Rivas-Villegas' brief use of his foot to press Plaintiff to the ground. Judge Collins' Dissent at 28 n.2. The fact that Plaintiff did not feel the foot on his back does not make the push irrelevant, because that fact does not negate the possibility that the push contributed to Plaintiff's alleged injuries. Once again, the significance of the push is for the jury, and not us, to decide. Nor is it particularly surprising that Plaintiff did not feel a foot on his body after he had absorbed two rounds from a beanbag shotgun. *Cf. Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) ("Because she was focused on regaining control of her breathing, [the plaintiff] does not recall feeling the impact of the pepper ball rounds on her body . . . .").

**[6]** Although *LaLonde*'s discussion of the test for qualified immunity may be outdated, it nonetheless establishes that certain uses of force, including the use of force similar to that employed in this case, violate the Fourth Amendment.

Judge Collins' dissent asserts that the facts here differ from those in *LaLonde* so much that a reasonable officer would not have been put on notice that pushing his knee into the back of a prone, unresisting, injured person violates the Fourth Amendment. Judge Collins' Dissent at 35–37. We disagree. Although the officers here responded to a more volatile situation than did the officers in *LaLonde*, the context was substantially similar. Indeed, rarely is a precedent as precisely aligned with the relevant actions. Both *LaLonde* and this case involve suspects who were lying face-down on the ground and were not resisting either physically or verbally, on whose back the defendant officer leaned with a knee, causing allegedly significant injury.

In *LaLonde*, officers responded to reported yelling inside a residence. 204 F.3d at 950–51. And much like here, the officers were warned that the plaintiff possessed a deadly weapon—a rifle in that case. *Id.* at 951. The officers also were told that they "should be careful because [the plaintiff] might be willing to use [that weapon]." *Id.* And much like here, the plaintiff at first declined to comply with police requests. *Id.* at 951–52.

The similarities increase at what *Graham* teaches to be the most critical moment: when excessive force was employed. 490 U.S. at 396. In *LaLonde*, an officer "forcefully put his knee into [the plaintiff's] back" after the plaintiff had been sprayed with pepper spray and had stopped resisting arrest. 204 F.3d at 952, 959 n.17. Here, at the time in question, Plaintiff was prone, similarly was not resisting arrest, and similarly was visibly injured by a prior use of force. If anything, Plaintiff was more subdued—and thus less of a threat—after having been shot twice by a beanbag shotgun rather than having been pepper-sprayed. As in

*LaLonde*, Rivas-Villegas "deliberately dug his knee into [Plaintiff's] back" with enough force to cause injury.[7]  *Id.* at 959 n.17.  The court concluded in *LaLonde* that the officers were not entitled to qualified immunity.  *Id.* at 962.  Officers in Rivas-Villegas' position were thus on notice that their substantially similar conduct is unconstitutional.

Judge Collins' dissent seems to argue that, because Plaintiff was accused of a serious crime and initially appeared noncompliant, police could use force throughout the encounter without violating the Fourth Amendment.  Judge Collins' Dissent at 29–30.  But just as circumstances can escalate rapidly, justifying "split-second judgments" to use force that might have been excessive a moment earlier, *Graham*, 490 U.S. at 397, circumstances can de-escalate rapidly.  Logic thus dictates that the reverse is true, too:  a use of force that may have been reasonable moments earlier can become excessive moments later.

Defendants also argue that the method they used to handcuff Plaintiff is a standard procedure, designed to minimize injuries and confrontations.  But the fact that a particular practice is standard, or that it usually results in no harm, does not insulate its use in every case.  For example, we have repeatedly held that "tight handcuffing can constitute excessive force," even though handcuffing is a generally standard and appropriate practice.  *LaLonde*, 204 F.3d at 960

---

[7] Plaintiff's arrest was captured on videotape.  The videotape shows that Rivas-Villegas intentionally dug his knee into Plaintiff's back.  Although the videotape does not establish how strenuously Rivas-Villegas dug his knee into Plaintiff's back, that factual dispute is for the jury to consider.  And the existence and degree of any resultant injury are for the jury, as fact-finder, to determine.

(citing *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993); *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989)). And the amount of force that may be reasonable when applied to the back of a large, fit individual to effect an arrest may be excessive as applied to a small, frail individual. The facts of each case matter.

For similar reasons, the dissent's fear that our holding likely will "eliminate the use of a knee to protectively hold down a non-resisting suspect while handcuffing him," Judge Collins' Dissent at 36, is unwarranted. We hold only, as we have before, that police may not kneel on a prone and non-resisting person's back so hard as to cause injury. *LaLonde*, 204 F.3d at 959. Just as our tight-handcuff cases have not eliminated handcuffs, our holding today should not infringe on an officer's ability to secure a compliant and prone suspect without injury.

We conclude that there is a genuine issue of fact as to whether the force that Rivas-Villegas used was excessive and that, if Plaintiff's allegations are true, precedent informed Rivas-Villegas that the force was excessive. We therefore reverse the judgment in favor of Rivas-Villegas and remand for further proceedings.

D. *Officer Kensic*

Plaintiff asserts that Kensic failed to intervene to prevent the excessive force employed by Leon and Rivas-Villegas. But there is no evidence that Kensic knew what the other defendants would do, and the events unfolded very rapidly—in a matter of seconds. Kensic therefore lacked any realistic opportunity to intercede. *See Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000) (holding that officers

can be held liable for failing to intervene only if they had a realistic opportunity to do so).  We therefore affirm the judgment in favor of Kensic.

E.  *Monell and State-Law Claims*

Plaintiff asserts that, under *Monell*, the City is liable for the officers' constitutional violations.  The district court dismissed Plaintiff's *Monell* claim because it had granted summary judgment to the individual Defendants.  Because we reverse the grant of summary judgment as to Rivas-Villegas, we remand to the district court for consideration of the other elements of Plaintiff's *Monell* claim and whether that claim "can properly be resolved on summary judgment even if the constitutional violation question cannot."  *Glenn*, 673 F.3d at 880.  For the same reason, we reinstate Plaintiff's state-law claims relating to Rivas-Villegas' conduct.  *See Wall v. Cty. of Orange,* 364 F.3d 1107, 1112 (9th Cir. 2004) (reinstating state-law claims in similar circumstances).  On remand, the district court can reconsider whether to exercise jurisdiction over those claims.

**AFFIRMED** as to the federal claims against Defendant Leon and Defendant Kensic; **REVERSED** and **REMANDED** for further proceedings as to all other claims. The parties shall bear their own costs on appeal.

---

GILMAN, Circuit Judge, concurring in part and dissenting in part:

I fully concur in the portions of the majority opinion regarding the disposition as to Sergeant Robert Kensic and

Officer Daniel Rivas-Villegas. On the other hand, I respectfully dissent from the portion affirming the grant of summary judgment in favor of Officer Manuel Leon. We are not being asked to decide whether Cortesluna will prevail at trial on his excessive-force claim against this officer. The question before us is simply whether a jury could reasonably find in Cortesluna's favor based on the facts that he has presented. I have no doubt that it could.

## I

The key question for a jury to decide is whether a reasonable officer would have felt immediately threatened by Cortesluna at the time that Officer Leon shot Cortesluna with two rounds from the officer's beanbag shotgun. *See C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (holding that the most important question is "whether the suspect posed an immediate threat to the safety of the officers or others" (internal citation and quotation marks omitted)). The two photos attached to this dissent clearly support the proposition that Cortesluna posed no immediate threat to any of the officers present. In both photos, which are exhibits from Cortesluna's home-security camera, Cortesluna is shown standing still with his head and hands down. Photo 1 shows Officer Leon firing the first beanbag round at Cortesluna from a distance of approximately 10 feet. Roughly a second later, Photo 2 shows the second beanbag round being fired.

Even with a knife shown protruding blade up in Cortesluna's left front pocket, there is no indication that he was in the act of reaching for it when the rounds were fired. And with the knife blade up rather than down, there was no way that he could have quickly taken it from his pocket to

threaten the officers. This is especially so when one takes into account that *five* police officers were present, *all with their guns trained on Cortesluna*. I frankly fail to see how anyone looking at these photos would deduce that Cortesluna was an immediate threat to any of the officers under the circumstances. A jury could instead easily find that Officer Leon was a trigger-happy member of the police force who literally "jumped the gun" in a display of excessive force. This is amply shown by Officer Leon saying "I'm going to hit him with less lethal" (the beanbag shotgun) even before Cortesluna had emerged from the house. Maj. Op. at 7.

The majority, moreover, appears to acknowledge the strength of Cortesluna's claim against Officer Leon despite their unwillingness to let a jury decide the issue. In denying qualified immunity to Officer Rivas-Villegas, for example, the majority acknowledges that "the knife was protruding blade-up such that it would not have been possible for Plaintiff to grab it and attack anyone." Maj. Op. at 15. Yet Officer Leon proceeded to shoot Cortesluna twice with the beanbag rounds without making any effort whatsoever to ascertain that Cortesluna's possession of the knife posed no immediate threat.

The majority also recognizes the teaching of *Graham v. Connor*, 490 U.S. 386, 396 (1989), that the most critical moment is "when excessive force was employed." Maj. Op. at 17. Yet Cortesluna was totally passive at the time he was shot, despite his earlier aggressive actions as reported to the police dispatcher. And even well before the shooting, when the officers first saw Cortesluna, he was observed doing nothing more that standing in the house "drinking a beer." Maj. Op. at 6.

Finally, the majority acknowledges the need to consider the various factors set forth in *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), when analyzing an excessive-force claim, Maj. Op. at 10, n. 3, but fails to give them appropriate weight. The application of these factors—including the serious harm that can be caused by a beanbag shotgun, the lack of any effort by Officer Leon to warn Cortesluna, and the absence of any resistance or attempt to flee by Cortesluna—all tilt in his favor. In sum, I believe that there is more than sufficient evidence to raise a genuine dispute of material fact regarding the excessive-force claim against Officer Leon.

## II

The use of excessive force by a police officer, of course, is in violation of the victim's constitutional rights. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013). And whether the force used was excessive is generally a question for the jury. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc). This brings us to the second issue of whether Cortesluna's right not to be shot was "clearly established at the time of [Officer Leon's] actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *See Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

Existing precedent does not require a prior case with the exact same facts. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) ("[T]his Court's caselaw does not require a case directly on point for a right to be clearly established[.]" (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017))). The law instead requires "[p]recedent involving *similar* facts." *See id.* at 1153 (emphasis added). And here the existing

precedent is close enough to have put Officer Leon on notice that his actions constituted excessive force.

In *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), for example, this court held that shooting a beanbag round at an emotionally disturbed individual who was walking directly towards an officer was excessive. *Id.* at 1282. The court emphasized that its "conclusion [wa]s strongly supported by [the] failure to give Deorle any warning that he would be shot if he approached any closer." *Id.* So too here: Officer Leon gave Cortesluna no warning that he would be shot if he did not put his hands up. And Deorle arguably presented a greater threat to the officers than did Cortesluna because Deorle had been "brandishing a hatchet at a police officer," "remained agitated and continued to roam on or about the property," and was carrying "an unloaded plastic crossbow in one hand and what may have been a can or a bottle of lighter fluid in the other." *Id.* at 1276–77. Although Deorle dropped the hatchet and crossbow when instructed to do so, he had been walking directly towards the officers when he was shot. *Id.* The court in *Deorle* made clear that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* at 1281.

Other precedent exists regarding the concept of passive resistance. *See Emmons v. City of Escondido*, 921 F.3d 1172, 1175 (9th Cir. 2019) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008." (quoting *Gravelet-Blondin*, 728 F.3d at 1093)). In *Gravelet-Blondin*, the police tased a suspect who refused requests to show his hands. 728 F.3d at 1089. Although the police had been warned that the suspect "owned a gun and would have it with

him," *id.*, this court nonetheless concluded that "Blondin engaged in no behavior that could have been perceived . . . as threatening or resisting," *id.* at 1094.  His refusal to obey commands instead constituted "mere passive resistance," *id.* 1093, and, "[a]s a result, the use of non-trivial force of any kind was unreasonable," *id.* at 1094.

So even if Cortesluna was disobeying Sergeant Kensic's instruction to put his hands up (probably because Cortesluna was understandably confused by Officer Leon's immediately preceding instruction to get down on the ground), a jury could find that this was at most passive resistance. The attached photos support such a finding, where Cortesluna is shown standing still, head down, and approximately 10 feet away from the five assembled officers when the first beanbag round was fired.  *See* Photo 1.

Officer Leon's firing of the *second* round (Photo 2) strikes me as even less justified. At that point Cortesluna's hands are moving away from his sides and thus further from the knife in his left front pocket. In my opinion, this evidence is more than sufficient to place this case in the category acknowledged by the majority as an obvious case "where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." Maj. Op. 12, n. 4 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

For all of the above reasons, I would reverse the grant of summary judgment in favor of Officer Leon and remand the case for further proceedings as to all of the defendants other than Sergeant Kensic.

# APPENDIX



**Photo 1**



**Photo 2**

COLLINS, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion insofar as it partially affirms the district court's judgment dismissing Ramon Cortesluna's claims of excessive force in connection with his arrest. However, I disagree with the majority's reversal of the judgment in favor of Officer Daniel Rivas-Villegas and its partial reversal of the judgment dismissing Cortesluna's claims against the City of Union City. I would affirm the judgment in its entirety, and I therefore respectfully dissent from sections III(C) and III(E) of the majority's opinion.

# I

The arrest in this case was videotaped by Cortesluna's home-security camera. Where, as here, "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," we should review the summary judgment order by "view[ing] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007).[1] That videotape shows that, after being hit by the beanbag rounds, Cortesluna turned and began to lie face-down on the ground. As Cortesluna was doing so, Rivas-Villegas approached and briefly placed his foot on Cortesluna's back in order to more quickly get him to lie flat

---

[1] At my request, the Clerk of the Court has posted the videotape on the Court's public website at this link: https://cdn.ca9.uscourts.gov/datastore/opinions/media/19-15105-Cortesluna-Videotape.mp4

on the ground.**[2]**  Rivas-Villegas then straddled Cortesluna, with his right foot on Cortesluna's right side and his left leg bent at the knee on Cortesluna's left side, where Cortesluna had a knife in his pocket.   Both Rivas-Villegas and Cortesluna testified that the knee was *on* Cortesluna's back; Rivas-Villegas said that he did that in order to prevent Cortesluna from trying to get back up while he was being handcuffed.  In that limited sense, it can perhaps be said, as the majority tendentiously puts it, that Rivas-Villegas's holding Cortesluna down with his knee amounted to having "dug his knee into Plaintiff's back." *See* Maj. Opin. at 18 n.7. But the videotape also confirms that, to the extent that Rivas-Villegas placed his knee on Cortesluna's back, Rivas-Villegas did not jump on his back or otherwise "drop" his knee into his back.  Rivas-Villegas was in this position for no more than eight seconds before standing up, at which time another officer handcuffed Cortesluna's hands.

Having viewed this videotape multiple times, I do not think that the force Rivas-Villegas used could reasonably be described as excessive.  But even if I did, I think it is clear that Rivas-Villegas would be entitled to qualified immunity.

---

**[2]** For excessive force purposes, we may disregard this brief placement of Rivas-Villegas's foot, because Cortesluna testified at his deposition that he did not even recall feeling the officer's foot, but only his knee.  The majority contends that there is a triable issue as to whether "the push contributed to Plaintiff's alleged injuries," *see* Maj. Opin. at 16 n.5, but that misses the point.  The push is only relevant if it constituted *excessive* force in violation of constitutional standards, and a push that was so minor that Cortesluna does not even recall feeling it cannot reasonably be viewed as "excessive."  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992) ("the nonmoving party's inferences [must] be reasonable in order to reach the jury").

## A

The test for determining the reasonableness of the force used to effectuate an arrest "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The obvious severity of the suspected crime in this case weighs in favor of affirmatively using protective force in arresting Cortesluna, but the majority concludes that the circumstances concerning the other two principal *Graham* factors "altered dramatically" in the mere eight seconds after Cortesluna was shot with the beanbag rounds. *See* Maj. Opin. at 14. I disagree.

The suggestion that Cortesluna suddenly "no longer posed a risk" at the moment the beanbag shots were fired, *see* Maj. Opin. at 14–15, is factually unreasonable. Cortesluna was carrying a pick tool when he first approached the officers and, after putting that down, he disobeyed the officers' instructions to keep his hands up and instead lowered his hands to where a long knife was protruding from his pocket. *See id*. at 7–8. After being shot with the beanbag rounds and starting to get on the ground, Cortesluna still had the knife in his *left* pocket—*i.e.*, on the side where Rivas-Villegas placed his knee. Using a knee on that side to ensure that Cortesluna stayed down and did not make a motion toward the knife was eminently reasonable in light of what the officers knew about the situation. *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) ("we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"). The majority

erroneously discounts the threat presented by the knife, asserting that, because it was "protruding blade-up" in Cortesluna's pocket, "it would not have been possible for Plaintiff to grab it and attack anyone." See Maj. Opin. at 15. The majority overlooks the fact that, as the videotape makes clear, the knife was loosely sitting in the large pocket of Cortesluna's baggy pajama bottoms—meaning that Cortesluna could have fit his hand into the pocket to reach the handle.

The majority's reasoning is also legally flawed, because it ignores the Supreme Court's pointed admonition to this court not to confidently downplay, from the comfort of our chambers, the dangers that officers face in making arrests:

> [T]he panel majority did not heed the District Court's wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. With the benefit of hindsight and calm deliberation, the panel majority concluded that it was unreasonable for [the officers] to fear that violence was imminent. But we have instructed that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."

*Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (citation omitted). And for the same reason, the majority improperly discounts the need for precautionary measures (such as holding the suspect down during handcuffing) in order to address the risk that a suspect who is not then actively resisting may decide to start resisting before the handcuffs are actually placed on him. It is quite wrong for the "panel majority—far removed from the scene and with the opportunity to dissect the elements of the situation—confidently [to] conclude[] that the officers really had no reason to fear for their safety or that of anyone else." *Id.* at 475.

The majority also relies on the fact that Cortesluna claims to be experiencing ongoing pain as a result of Rivas-Villegas's eight-second use of his knee to hold Cortesluna down during his arrest. *See* Maj. Opin. at 15. I agree that, on summary judgment, we have to take as true Cortesluna's statements that he has experienced ongoing pain in his back and neck ever since his arrest, but I disagree with the suggestion that, on this record, that contention is sufficient to raise a reasonable inference of excessive force.

Although "injuries are not a precondition" to an excessive force claim, we have sensibly recognized that the extent and nature of any injuries that do or do not result from a given use of force may reveal something about the extent of the force used. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). For example, where the force used produced "a broken vertebra which caused [the arrestee] both pain and immobility," a reasonable trier of fact could conclude that the force used was "severe." *Santis v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002). Conversely, "[w]e may infer from the minor nature of a plaintiff's injuries that the force applied was minimal." *Felarca*, 891 F.3d at 817. However, we must

always keep in mind that, because the excessive force inquiry turns on what the officer knew at the time, *see Kingsley*, 576 U.S. at 399, any later-occurring claimed injuries are only relevant to the extent that their severity suggests an objective level of force that a reasonable officer on the scene would have recognized at the time to be significant and potentially injurious.   Under these standards, Cortesluna's claim of subjective pain is not enough to defeat summary judgment.

Here, the videotape confirms that nothing about Rivas-Villegas's brief use of his knee involved an objective level of force that was likely to produce serious injury.   And in contrast to *Santos*, Cortesluna has not submitted any evidence in opposition to summary judgment (such as medical records) that would show that the claimed subjective pain has its origin in an underlying physical injury of a type that would support an inference that the force that produced it was excessive.[3]  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (affirming summary judgment on excessive force claim and noting that "Arpin's claim of injury is equally unsupported as she does not provide any medical records to support her claim that she suffered injury as a result of being handcuffed"); *see also Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (arrestee's claims that "he has suffered nerve damage in his arms as a result of being in handcuffs" and experiences "pain" as a consequence were insufficient to

---

[3] In connection with their reply in support of their summary judgment motion, *Defendants* submitted summaries of the medical testimony that Plaintiffs expected to present at a trial, and those summaries focus largely on hip and leg injuries from the incident—*i.e.*, injuries attributable to the bean-bag shots.  In all events, those summaries do not specifically tie any injury to the knee-press.

defeat summary judgment on excessive force claim where arrestee "presents no medical records indicating he suffered any long-term injury as a result of the handcuffs"). On this record, and given these objective circumstances, the mere fact that Cortesluna subsequently claimed ongoing subjective pain is not enough, by itself, to raise a reasonable inference that an objectively unreasonable level of force was used at the time of the arrest. But under the majority's opinion, it is now apparently the law in the Ninth Circuit that all an arrestee has to do to get a jury trial on an excessive force claim—including defeating qualified immunity—is to assert that the arrest resulted in ongoing subjective pain. For the reasons I have explained, that is not correct.

I would hold that, even construing the record evidence in the light most favorable to Cortesluna, no reasonable jury could find that Rivas-Villegas used excessive force.[4]

---

[4] The majority properly does not rely on Cortesluna's further claim that Rivas-Villegas should not have lifted him from the ground by grabbing his handcuffs. As the district court noted, Cortesluna does not claim that his "handcuffing and movement" caused any injury, *see Cortesluna v. Leon*, 2018 WL 6727824, at \*11 (N.D. Cal. Dec. 21, 2018), and on this record, no reasonable jury could find that this method of lifting Cortesluna amounted to excessive force. The only federal case Cortesluna cites to support his argument on this score is *Wall v. County of Orange*, 364 F.3d 1107 (9th Cir. 2004). But in *Wall*, the arresting officer suddenly twisted the arm of a compliant, unarmed arrestee, slammed him face-first into a nearby vehicle, put "extremely tight" handcuffs on him, and then threw him by his handcuffed arms head-first into a patrol car. *Id.* at 1109–10, 1112. Of course, nothing similar is involved here. Moreover, in *Wall*, our finding of excessive force rested on the officer's overly tight handcuffing, and not on the officer's movement of the suspect by his handcuffs or handcuffed hands. *See id.* at 1112.

## B

Alternatively, I conclude that, at a minimum, Rivas-Villegas's actions did not violate clearly established law and that he therefore is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The majority errs in holding otherwise.

Officers are entitled to qualified immunity in § 1983 actions unless they violate "clearly established" rights. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that *every reasonable official* would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (emphasis added) (citations and internal quotation marks omitted). Moreover, in explaining how to determine whether the law was sufficiently clear for purposes of qualified immunity, the Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citations and internal quotation marks omitted); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). This obligation to define clearly established law with specificity "is particularly important in excessive force cases." *Emmons*, 139 S. Ct. at 503. As the Supreme Court has explained:

> "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant

legal doctrine, here excessive force, will apply
to the factual situation the officer confronts.
Use of excessive force is an area of the law in
which the result depends very much on the
facts of each case, and thus police officers are
entitled to qualified immunity unless existing
precedent *squarely governs* the *specific* facts
at issue."

*Emmons*, 139 S. Ct. at 503 (emphasis added) (quoting *Kisela*,
138 S. Ct. at 1153).

In concluding that "existing precedent squarely governs
the specific facts" of this case, *see id*., the majority relies
solely on our decision in *LaLonde v. County of Riverside*,
204 F.3d 947 (9th Cir. 2000). *See* Maj. Opin. at 16–18. In
my view, the facts of *LaLonde* are materially distinguishable
from this case and are therefore insufficient to have made
clear to "every reasonable" officer that the force Rivas-
Villegas used here was excessive. *Wesby*, 138 S. Ct. at 589.

In *LaLonde*, while responding to a noise complaint, a
police officer first tried to pin down an unarmed LaLonde and
then sprayed him in the face with pepper spray. 204 F.3d
at 952. After that, a different officer, while handcuffing
LaLonde, "deliberately dug his knee into LaLonde's back
with a force that caused him long-term if not permanent back
injury." *Id*. at 952, 959 n.17; *see also id*. at 952. The only
material similarities between *LaLonde* and this case are that
Rivas-Villegas briefly pressed his knee into Cortesluna's
back while securing his arms for handcuffing; Cortesluna was
not then actively resisting; and Cortesluna claims that the
press of Rivas-Villegas's knee has caused him continuing
pain. The majority finds those commonalities to be

dispositive, *see* Maj. Opin. at 17–18, but in doing so, it ignores several critical differences between *LaLonde* and this case.

In *LaLonde*, the officers were responding merely to a neighbor's complaint that LaLonde was making too much noise in his apartment, *see* 204 F.3d at 950–51, whereas Rivas-Villegas and his colleagues were responding to an alleged incident of domestic violence that, according to the police dispatch he heard, reportedly included the suspect's manual use of a chainsaw to break something in the house. And LaLonde was unarmed, *see* 204 F.3d at 951, whereas Cortesluna was carrying a pick tool when he first approached the officers and, after putting that down, he still had a long knife protruding from his *left* pocket (*i.e.*, on the side where Rivas-Villegas placed his knee). There is a very significant difference between using a knee to hold down a person who is suspected of a serious violent crime who is armed with a knife (as in this case) and using a knee to hold down a noisy neighbor armed with nothing more than a sandwich (as in *LaLonde*). *See id*. at 951–52 (noting that LaLonde was "holding a sandwich in his hand" and that, when the officer first grabbed LaLonde, he "knocked the sandwich to the floor").

By ignoring the multiple critical differences between this case and *LaLonde*, the majority thereby improperly defines the legal rule established in *LaLonde* at too high a level of generality. *See Kisela*, 138 S. Ct. at 1152. Indeed, the practical effect of the majority's ruling today will likely be to eliminate the use of a knee to protectively hold down a non-resisting suspect while handcuffing him. The majority discounts that possibility, claiming that it has merely reaffirmed that "police may not kneel on a prone and non-

resisting person's back *so hard as to cause injury*." *See* Maj. Opin. at 19 (emphasis added). But this disregards the fact that an officer on the scene *cannot know whether the arrestee will later claim ongoing subjective pain*; the officer can only know what his or her objective actions are and what the arrestee's contemporaneous response is. Here, the officers' body-cameras' audiotapes confirm that, from the moment he was shot with the beanbags, Cortesluna moaned in pain during his arrest and that Cortesluna did not say at the time that the *knee* was hurting him. On this record, there was nothing about the then-knowable circumstances that would suggest to the officer that the force here was excessive. Under the majority's opinion—in which a later claim of ongoing subjective pain from the use of a knee is all you need to get to a jury—an officer would be taking a significant risk by using a knee to secure an arrestee during handcuffing. The majority discounts this concern, noting that our "tight-handcuff cases" have not "eliminated handcuffs." *See* Maj. Opin. at 19. But our tight-handcuff cases have not done so presumably because (unlike today's flawed ruling) those cases have not allowed arrestees to defeat summary judgment on an excessive force claim merely by claiming ongoing subjective pain. *See*, *e.g.*, *Arpin*, 261 F.3d at 921–22; *Peterson v. Union Pac. R.R. Co.*, 480 F. App'x 874, 874 (9th Cir. 2013); *see supra* at 31–33.

Once again, a panel of this court disregards the Supreme Court's repeated admonition that, in the excessive force context, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (citation omitted). Because neither *LaLonde* nor any other existing precedent governs the specific facts presented here, Rivas-Villegas is entitled to qualified immunity.

## II

Finally, the majority reinstates Cortesluna's state-law claims and his claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), insofar as they relate to Rivas-Villegas's conduct. *See* Maj. Opin. at 20. Given that I conclude that Rivas-Villegas did not use excessive force, there is no predicate for *Monell* liability against the City. And because I would thus affirm the district court's judgment with respect to all of the § 1983 claims, there is in my view no basis for reversing the district court's dismissal of the pendent state-law claims without prejudice.

Accordingly, I would affirm the judgment of the district court in its entirety. I respectfully dissent from the majority's decision to the extent that it fails to do so.